IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20-cr-00112 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CARL O'NEIL | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Carl O'Neil is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The charge was brought after Chicago Police Department ("CPD") officers stopped O'Neil on July 21, 2019 because he matched the description of a man who had just been observed openly carrying a firearm on a public sidewalk. O'Neil now moves to suppress the evidence derived from that stop. (Dkt. No. 93.) For the reasons that follow, O'Neil's motion to suppress is denied.

BACKGROUND

Neither the Government nor O'Neil dispute the material facts, and both parties agree that an evidentiary hearing is not necessary to resolve the motion to suppress. Thus, the following facts—based predominantly on video footage captured by a POD camera[1] and the involved CPD officers' body-worn cameras—are undisputed.

Shortly after midnight on July 21, 2019, a CPD officer remotely operating a POD camera was observing a large crowd that had formed near the intersection of 12th Place and South Fairfield Avenue in Chicago, Illinois. Eventually, the officer focused the POD camera on a Black man in a white tank top and loose-fitting jeans, running away from the crowd and looking over

---

[1] A POD camera is a video surveillance camera issued by the CPD that is usually placed in high-crime areas.

his shoulder. That man was later identified as O'Neil. O'Neil slowed down as he approached a Chevrolet four-door sedan. As he approached the Chevrolet, O'Neil's right hand appeared to be grasping something near his waistband. When O'Neil came to a stop, he removed an object that appeared to be a firearm. Then, he turned to the front driver's side door of the Chevrolet, opened it, and reached his arm into the vehicle as if he was dropping the object on the driver's seat. After closing the front driver's side door, O'Neil turned to walk back toward the crowd. Another officer viewing the POD camera footage radioed officers in the area to report what he had observed and a description of the suspect.

O'Neil returned to the Chevrolet about a minute later and briefly stood by the front driver's side door. He then turned to walk back toward the crowd until stopping to interact with a smaller group of people who were walking in the direction of the Chevrolet. After approximately two minutes, O'Neil resumed walking, soon passing a group of CPD officers walking in the opposite direction toward the Chevrolet. One of the officers, Sergio Aponte, had learned over the radio that a man in a white tank top had placed an apparent firearm inside the vehicle. Thus, Aponte approached the Chevrolet and used his flashlight to look into the passenger compartment where he observed in plain view a firearm on the driver's seat. Aponte then notified the other officers in the area of his discovery.

About thirty seconds later, another CPD officer, Joshua Blas, stopped O'Neil as he approached the intersection of 12th Place and South Fairfield Avenue, approximately 245 feet north of where the Chevrolet was parked. Blas stopped O'Neil because he had learned from other officers that a man matching his description had been seen placing an apparent firearm inside the Chevrolet. Shortly after stopping O'Neil, Blas handcuffed him. Blas asked O'Neil where he was coming from. Another female officer asked O'Neil for his name. In response, O'Neil identified

himself and reached his hand toward his pocket. The female officer instructed O'Neil not to reach into his pocket. When O'Neil asked what was going on, Blas advised O'Neil that he was "just being detained" and the "cuffs come off as easily as they come on."

CPD lieutenant Ignacio Hernandez then approached O'Neil and asked for his name and some identification. After O'Neil told Hernandez that he had an identification card in his front pocket, Hernandez reached into O'Neil's front pocket and retrieved it. Hernandez asked O'Neil, "What you been locked up for?" He then directed other officers to put O'Neil into the adjacent police SUV. Before placing O'Neil in the SUV, officers again searched O'Neil's pockets. At the same time, the female officer advised a group of people watching the encounter that O'Neil was "just being detained" and, as soon as the police finished their investigation, "if there's nothing, he's good to go."

Upon discovering that the police SUV was locked, the officers walked O'Neil to a police wagon parked across the street. As O'Neil was taken inside the wagon, Blas again told O'Neil that the police were "just investigating." Once inside the wagon, officers checked O'Neil's pockets for a third time, this time removing his phone and keys. The officers then fastened a seatbelt around O'Neil and left him handcuffed inside the wagon. Meanwhile, the female officer took O'Neil's identification card to a different police vehicle and conducted a background check, which revealed that O'Neil had a prior criminal history and was currently on parole. About ten minutes after Blas initially stopped O'Neil, the officer driving the police wagon received an instruction to take O'Neil to the police station. When O'Neil arrived at the police station, he was processed and taken into an interview room, where he was advised of his *Miranda* rights.

Instead of searching the Chevrolet on the scene, officers had the car towed to the police station and then obtained a warrant to search it. The subsequent search of the Chevrolet

confirmed the presence of a firearm inside the vehicle on the driver's seat. Also recovered during the search were a black ski mask, a notice of court date for "CARL A ONEAL JR," and a citation for "Carl A O'Neal Jr."[2]

## DISCUSSION

O'Neil asks the Court to suppress all evidence obtained by CPD officers as a result of their warrantless encounter with him on July 21, 2019. While O'Neil concedes that the CPD officers had sufficient reasonable suspicion to conduct a brief, investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), he argues that his Fourth Amendment rights were nonetheless violated when the officers proceeded to conduct multiple, extensive searches of his person, and it was only because of those unlawful searches that the officers learned that he was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Consistent with the Fourth Amendment to the United States Constitution, a law enforcement officer may conduct a brief investigative stop of a person if he can "point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) (citing *Terry*, 392 U.S. at 21–22). During an investigative stop, a law enforcement officer may conduct a frisk, or "a limited pat down of the suspect's outer clothing to search for weapons," but only if the officer "can 'point to specific and articulable facts' indicating 'that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous.'" *United States v. Howell*, 958 F.3d 589, 598 (7th Cir. 2020) (quoting *Terry*, 392 U.S. at 21, 24–25); *see also United States v. Lopez*, 907 F.3d 472, 485 (7th Cir. 2018) ("Even when a *Terry* stop is justified, whether a frisk is also justified is a separate question."). According to O'Neil, the CPD officers here went well beyond

---

[2] The Indictment lists "Carl O'Neal" as an alias for O'Neil.

the bounds of a permissible frisk by repeatedly searching his pockets—even after an initial search confirmed that he was not presently armed—and seizing his identification and other possessions.

In response, the Government argues that, even though the officers' conduct did not exceed the scope of what is allowable during an investigative stop, the Court need not decide that issue because the officers had probable cause to arrest O'Neil. "For a warrantless arrest to be reasonable, law enforcement [officers] must have probable cause, which exists if, given the facts and circumstances within their knowledge at the time of arrest, the [officers] reasonably believed that the suspect had committed or was committing a crime." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). To have probable cause to arrest, it is enough that an officer has reason to believe "that the arrestee committed any offense, regardless of the crime charged or the crime the officer thought had been committed." *United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015). Probable cause is a more demanding standard than reasonable suspicion. *Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002). And "a person stopped on probable cause may be searched fully," whereas "a person stopped on reasonable suspicion may be patted down but not searched." *United States v. Childs*, 277 F.3d 947, 952 (7th 2002). Thus, "[i]f an officer has probable cause to arrest, she also may conduct a search incident to that lawful arrest without any additional justification." *United States v. Paige*, 870 F.3d 693, 700 (7th Cir. 2017).

The Court agrees that the facts here demonstrate that the officers had probable cause to arrest O'Neil from the moment he was stopped. In determining the existence of probable cause, the Court accounts for the fact that the CPD officers on the scene and the CPD officers operating the POD camera were all in communication with each other about the relevant events. Consequently, under the collective knowledge doctrine, "the knowledge of one officer can be

5

imputed to the other officers." *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000). When the collective knowledge doctrine applies, "the police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (internal quotation marks omitted). "The arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." *Id.* (internal quotation marks omitted).

At the time that O'Neil was stopped, the CPD had learned that a man matching O'Neil's description had been seen with an object resembling a gun in his hand and then placed that object onto the driver's seat of a Chevrolet. Officers investigating confirmed that there was a gun in plain view on the driver's seat of the Chevrolet. O'Neil was stopped just 245 feet away from the Chevrolet. Finally, the officer operating the POD camera had tracked O'Neil's movements from the time he approached the Chevrolet to the time he was stopped by Blas. It is true that the officers would not learn facts suggesting that O'Neil committed the offense of being a felon in possession until after searching O'Neil and using his identification to run a background check. By the time Blas stopped O'Neil, however, the facts known to the CPD established probable cause to believe that O'Neil had unlawfully used a firearm in violation of Illinois law.

In Illinois, it is unlawful for a person to carry a firearm in public unless they have a concealed carry permit. 720 ILCS 5/24-1(a)(4)(iv). But even a concealed carry permitholder is only allowed to carry a "concealed firearm," meaning "a loaded or unloaded handgun carried on or about a person completely or mostly concealed from the view of the public." 430 ILCS 66/5; *see also* 430 ILCS 66/10(c)(1). It is therefore unlawful for a person to display a firearm openly in public, even if they have a concealed carry permit. *United States v. Thomas*, No. 21-cr-00375-1,

2022 WL 2915635, at *5 (N.D. Ill. July 25, 2022); *United States v. Triplett*, No. 20 CR 00665, 2020 WL 7319573, at *2 (N.D. Ill. Dec. 11, 2020); *United States v. Swinney*, 463 F. Supp. 3d 851, 857 (N.D. Ill. 2020). And when Blas stopped O'Neil, a CPD officer watching the POD camera footage had communicated to the officers on the scene that he saw O'Neil remove an object that appeared to be a firearm and carry it in plain view on a public sidewalk (in the vicinity of a large group of people).

The officers also knew that O'Neil placed the gun on the driver's seat of the Chevrolet, plainly visible through the window to any passerby. In attempt to demonstrate that this conduct was consistent with Illinois law, O'Neil emphasizes that the Chevrolet was locked and thus the gun was not immediately accessible. However, Illinois law expressly specifies that a concealed carry permit allows the permitholder to "keep or carry a loaded or unloaded concealed firearm ***on or about his or her person*** within a vehicle." 430 ILCS 66/10(c)(2) (emphasis added); *see also* 430 ILCS 66/5 (defining concealed firearm to include a firearm "on or about a person within a vehicle"). Thus, the officers could reasonably conclude that O'Neil acted inconsistent with Illinois law by leaving a gun in plain view inside an unattended vehicle, especially when O'Neil then walked almost 250 feet away from that vehicle. Whether O'Neil, in fact, committed a crime either by displaying the gun on a public sidewalk or by leaving it in the Chevrolet is not essential in the analysis, as "[p]robable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *Sawyer*, 224 F.3d at 679. Rather, the question is whether "the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part." *Id.* And the Court concludes that the facts known to the

CPD officers at the time of O'Neil's arrest gave them good reason to think there was a substantial chance that O'Neil had unlawfully used a firearm.

O'Neil contends that the officers could not have had probable cause to arrest him because they repeatedly assured him that he was only being detained. But just because the officers claimed the seizure was not an arrest does not necessarily make it so. *E.g.*, *Adamidis v. Cook County*, No. 19 CV 7652, 2022 WL 540762, at *6 (N.D. Ill. Feb. 23, 2022) ("[T]hat officers told [the arrestee] that he was being 'detained' rather than arrested does not matter."); *cf. United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) ("[T]here is no precedent for the contention that a law enforcement officer simply stating to a suspect that he is 'not under arrest' is sufficient to end the inquiry into whether the suspect was 'in custody' during an interrogation."). Even if the officers believed that they were merely conducting an investigative stop, "the question whether a person is under arrest is an objective one, not one that depends on the officers' beliefs." *United States v. Eymann*, 962 F.3d 273, 285 (7th Cir. 2020). Consequently, the fact that the officers told O'Neil that he was only being detained does not negate the existence of probable cause.

In sum, the Court finds that the information known to the CPD officers monitoring the situation on July 21, 2019 gave them probable cause to arrest O'Neil for unlawfully using a firearm. And given the existence of probable cause to arrest, the officers did not violate O'Neil's Fourth Amendment rights by searching him incident to his arrest.

## CONCLUSION

For the foregoing reasons, O'Neil's motion to suppress (Dkt. No. 93) is denied.

ENTERED:

Dated: December 14, 2022

Andrea R. Wood
United States District Judge

9